**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STARR TRANSIT COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> TEAMSTERS UNION LOCAL NO. 35, <br><br> Defendant. | Civil Action No. 21-14565 (GC) (DEA) <br><br> **MEMORANDUM OPINION** |

**CASTNER, District Judge**

      **THIS MATTER** comes before the Court upon Defendant Teamsters Union Local No. 35's Motion for Summary Judgment. (*See* ECF No. 22.) Plaintiff Starr Transit Company, Inc., opposed (*see* ECF No. 24), and Defendant replied (see ECF No. 27). The Court has carefully considered the parties' submissions, and it decides the matter without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78 and Local Civil Rule 78.1. For the reasons set forth herein, and for other good cause shown, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND[1]

### A.    Procedural History

      On August 3, 2021, Plaintiff Starr Transit Company, Inc. ("Starr Transit"), a New Jersey corporation, brought suit against Defendant Teamsters Union Local No. 35 (the "Union"), a labor

---

[1]    On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark New Jersey Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

organization located in New Jersey, for breach of contract and detrimental reliance.[2]  (*See* ECF No. 1.[3])  Starr Transit alleges that in 2005, when it merged the Starr Transit Pension Plan into the multi-employer Teamsters Union Local No. 35 Pension Plan (the "Union Plan"), the Union "agreed to indemnify and hold Starr harmless against any liability [that might later arise] by virtue of the withdrawal of any employer" from the Union Plan, including liability arising from the withdrawal of Starr Transit itself.  (*Id.* ¶¶ 5-17.)  In 2020, however, when Starr Transit elected to withdraw from the Union Plan, the Union refused to pay the $402,161.00 in withdrawal liability that Starr Transit was assessed under the Employee Retirement Income Security Act of 1974 ("ERISA").  (*Id.* ¶¶ 23-32.)

The Union answered the Complaint on September 2, 2021, and asserted affirmative defenses as well as counterclaims for (i) declaratory judgment on the issue of indemnification, and (ii) breach of fiduciary duty under ERISA against Alan Glickman, who held dual positions as the Chief Executive Officer of Starr Transit as well a Management Trustee of the Union Plan.  (ECF No. 5 ¶¶ 1-2, 22-38.)  Contrary to Starr Transit's allegations, the Union maintains that it agreed in 2005 to indemnify Starr Transit *only* against "the default or debt incurred by *other* contributing employers" of the Union Plan and that this limited indemnification "does not extend to Starr Transit's *own* contractual and statutory liability arising out of [Starr Transit's] decision to withdraw from the Union Plan."  (*Id.* ¶ 28 (first emphasis added).)

On October 25, 2021, Mr. Glickman moved under Rule 12(b)(6) to dismiss the breach of

---

[2]     The Court has jurisdiction pursuant to 29 U.S.C. § 185, which allows suits between an employer and a labor organization for violations of contracts to be brought in federal court.

[3]     Citations to page numbers within record documents (*i.e.*, "ECF Nos.") typically refer to the page numbers stamped on the document by the Court's e-filing system.  For citations to transcripts, however, the Court refers to the page and line numbers paginated by the reporter.

fiduciary duty counterclaim against him individually.  (ECF No. 11.)  Shortly thereafter, the parties by stipulation agreed that the counterclaim against Mr. Glickman would be dismissed with prejudice, and the Court entered the order on October 29, 2021, and terminated the motion to dismiss.  (ECF No. 14.)  The sole counterclaim that now remains is the Union's first claim for declaratory judgment on the issue of indemnification.

Following the completion of discovery, the Court entered a scheduling order directing the parties to file any motions for summary judgment by September 9, 2022.  (ECF No. 21.)  On September 9, Starr Transit wrote to inform the Court that it would not be moving for summary judgment because it had "conclude[d] that there are too many disputed issues of material fact for th[e] matter to be decided at the Summary Judgment stage."  (ECF No. 23.)  That same day, the Union moved for summary judgment on both counts in Plaintiff's Complaint, asking the Court to dismiss the case.  (ECF Nos. 22 & 22-22.)  Starr Transit opposed on October 7, 2022, and the Union replied on October 21, 2022.  (ECF Nos. 24 & 27.)

## B.    Undisputed Facts[4]

The Union is the collective bargaining representative for a group of bus drivers, mechanics, cleaners, and washers employed by Starr Transit.  (SMF & RSMF ¶ 1.)  The Union operates a multi-employer pension plan, the Union Plan, overseen by three Employer Trustees and three Union Trustees.  (SMF & RSMF ¶ 3.)  The CEO of Starr Transit, Mr. Glickman, had served as an Employer Trustee of the Union Plan (including from October 2003) and had attended quarterly meetings for the Plan.  (SMF & RSMF ¶ 4.)

---

[4]    Defendant's Statement of Material Facts ("SMF") is at ECF No. 22-1; Plaintiff's Response to the Statement of Material Facts ("RSMF") is at ECF No. 25; Plaintiff's Supplemental Statement of Material Facts ("SSMF") is at ECF No. 26; and Defendant's Response to Plaintiff's Supplemental Statement of Material Facts ("RSSMF") is at ECF No. 28.

In March 2005, the Union's President Daniel Kreiser began negotiations with Starr Transit and Mr. Glickman over a Collective Bargaining Agreement ("CBA") to replace the one set to expire on April 15, 2005 (*i.e.*, the 2002-2005 CBA). (SMF & RSMF ¶¶ 7-10.) One of the Union's objectives was to persuade Starr Transit to merge its single-employer pension plan with the multi-employer Union Plan. (SMF & RSMF ¶¶ 2, 11.)

During mediation sessions between the parties, Mr. Glickman raised concerns about Starr Transit joining the Union's Plan and whether the company would incur withdrawal liability if another participating employer left the plan after Starr Transit joined. (SMF & RSMF ¶ 15.) Despite this and other alleged reservations raised by Starr Transit,[5] the Union's representatives continued to try to persuade Mr. Glickman that Starr Transit joining the Union's Plan was in the company's and its employees' best interests. (SMF & RSMF ¶ 17; SSMF & RSSMF ¶ 5.)

On April 22, 2005, Richard Markowitz (counsel for the Union Plan) sent a letter to Mr. Glickman "in an effort to respond to questions . . . raised concerning the liability of an Employer which is a party to a multi-employer Pension Plan if another Employer ceases operations, goes out of business or goes bankrupt." (SMF & RSMF ¶¶ 4, 20-22.) In relevant part, Mr. Markowitz wrote that "if an Employer withdraws from a multi-employer plan in a complete or partial withdrawal, that particular Employer might be subject to withdrawal liability under 29 U.S.C. § 1381. The amount of such withdrawal liability will, of course, depend upon the funding status of

---

[5]      There are disputes as to what specific concerns Mr. Glickman raised or did not raise during the collective bargaining negotiations related to Starr Transit joining the Union Plan. The Union maintains that Mr. Glickman's concerns were almost entirely limited to what liability Starr Transit would assume if *other* employers went bankrupt and/or left the Plan. (*See, e.g.*, SSMF & RSSMF ¶¶ 30-34, 37-38, 45.) Starr Transit denies this and maintains that Mr. Glickman also raised concerns about Starr Transit's liability if the company itself decided to leave the Plan. (*See, e.g.*, SSMF ¶ 3.) The Union denies this. (RSSMF ¶ 3.) The Court does not rely on these disputed facts in deciding the present motion, and they do not preclude summary judgment because they are not material to the disposition.

the Pension Plan and the employer's share or percentage of total contributions to the Pension Plan. However, an Employer's withdrawal does not in any way impose any liability upon other Employers who are contributing Employers to the Pension Plan." (ECF No. 22-9 at 2-3.)

In mid-May 2005, Starr Transit and the Union met for the final round of collective bargaining negotiations. (SMF & RSMF ¶ 25.) Whether Starr Transit would join the Union Plan, and what liability it would assume if it did so, remained an open issue. (SMF & RSMF ¶¶ 25-27.) The mediator overseeing the negotiations split up the bargaining teams and began separate discussions. (SMF & RSMF ¶ 28.) The mediator then brought the parties together and, according to notes taken, made a supposal that Starr Transit have ten years to pay off its own single-employer plan's unfunded liability and that the Union provide a letter to indemnify Starr Transit if it were to merge its plan with the Union Plan. (SMF & RSMF ¶¶ 28-30.)

As a result of this final round of negotiations, Starr Transit and the Union broke the impasse and on June 10, 2005, entered into a new CBA with a contract term from April 16, 2005, through April 15, 2008 (*i.e.*, the 2005-2008 CBA). (SMF & RSMF ¶ 32; ECF No. 22-10 at 27.) In Article 21, "Pension," the 2005-2008 CBA states that "[t]he Employer shall merge its Pension Plan into the Teamsters Local 35 Pension Plan as of July 1, 2005 subject to the provision of an Agreement of Merger which shall then apply." (SMF & RSMF ¶ 33; ECF No. 22-10 at 17.)

After the new CBA was signed, Mr. Markowitz (the Union Plan counsel) drafted a June 14, 2005 letter on Union letterhead, signed by Mr. Kreiser (Union President),[6] and sent to Mr. Glickman (CEO of Starr Transit) that read:

> This will confirm our understanding relating to the merger of the Starr Transit Co. Inc. Pension Plan with the Teamsters Union Local No. 35 Pension Plan.

---

[6]      (*See* SMF & RSMF ¶¶ 35, 37, 39.)

> The Trustees of the Teamsters Union Local No. 35 Pension
> Plan and Teamsters Union Local No. 35 agree to indemnify and hold
> Starr Transit Co. Inc. harmless of any liability, damages or claims
> made against Starr Transit Co. Inc. or against the Starr Transit Co.
> Inc. Pension Plan by virtue of the withdrawal of *any employer* from
> participation in the Teamster Union Local No. 35 Pension Plan.
> Starr Transit Co. Inc. and its Pension Plan will have no liability in
> the event that *any other employer* withdraws from the Teamsters
> Union Local No. 35 Pension Plan.
>
> [(ECF No. 22-11 at 2 (emphases added).[7])]

Prior to the Union membership's June 29, 2005 vote to ratify the 2005-2008 CBA, the Union and Starr Transit "collaborated" to draft a Memorandum of Agreement ("MOA"), titled "Committee Recommended Starr Tours Memorandum of Agreement." (SMF & RSMF ¶ 41; ECF No. 22-12.) The MOA states in the "Pension" subsection that the "employer will enter the Union's pension plan as of 7-1-05" and that "[t]he Union will provide the Employer with a letter of indemnity holding the Employer harmless as to debts incurred due to *other employers* as out lined in Mr. Markowitz's letter." (SMF & RSMF ¶ 42; ECF No. 22-12 at 2 (emphasis added).) The citation to "Mr. Markowitz's letter" referred to the June 14, 2005 letter that had been signed by Mr. Kreiser and previously sent to Mr. Glickman. (SMF & RSMF ¶ 43.) The Union membership subsequently voted to approve the CBA. (SMF & RSMF ¶ 44.)

On July 25, 2005, Starr Transit and the Trustees of the Union Plan entered into an "Agreement of Merger," signed by both parties. (SMF & RSMF ¶¶ 46-47.) Section 5.5 of the Merger Agreement states that "[i]n the event there is a conflict between any terms of the CBA and

---

[7]     Mr. Glickman later testified that this letter "was extremely important" to him and was what Starr Transit had relied on for the indemnification promise and its belief that the indemnification would encompass the company's liability arising from its own withdrawal from the Plan. (SSMF & RSSMF ¶ 20; ECF No. 22-4 at 109:6-17.) In contrast, Mr. Kreiser testified that it was his and the Union's belief that the letter only indemnified Starr Transit for withdrawal liability based on other employers leaving the Plan. (SSMF & RSSMF ¶ 26; ECF No. 22-3 at 43:20-44:3.)

th[e] Agreement of Merger, the terms of th[e] Agreement of Merger shall control." (ECF No. 22-13 at 6.)  It then states that "[t]he Union will provide the employer a letter of indemnity holding Starr Transit . . . harmless as to debts incurred by *other contributing employers*.  Such letter shall be binding on the parties to this Agreement of Merger and is incorporated by reference hereto." (*Id.* (emphasis added).)

On August 12, 2005, the Union sent Mr. Glickman a letter on Union letterhead, again signed by Mr. Kreiser, which states:

> Pursuant to Section 5.5 of the Merger Agreement between the Teamsters Union Local No. 35 Pension Plan and the Starr Transit Co., Inc. Pension Plan, this communication constitutes the letter of indemnity which is to be sent to you on behalf of Teamsters Union Local No. 35.
>
> Teamsters Union Local No. 35 will hold Starr Transit Co., Inc. harmless for any claim made against it because of the default or debt incurred by *other contributing employers* to the Teamsters Union Local No. 35 Pension Plan.  Starr Transit Co., Inc. shall not be held liable or responsible for defaults or debts incurred by *other contributing Employers*.
>
> [(ECF No. 22-15 at 2 (emphases added).[8])]

From 2005 through 2020, the Union and Starr Transit negotiated successor CBAs, and those CBAs did not include any specific reference to Starr Transit being indemnified for its own withdrawal liability if it decided to withdraw from the Union's Plan.  (SMF & RSMF ¶¶ 53 & 54.) In January 2016, Starr Transit asked the Union Plan's actuaries and consultants for its estimated withdrawal liability if it were to withdraw that year.  (SMF & RSMF ¶ 57.)  In 2018, Starr Transit

---

[8]     Mr. Glickman testified that he had "no idea" why Mr. Kreiser sent him the August 12, 2005 letter and could not recall asking Mr. Kreiser, the Trustees of the Union Plan, nor anyone else about the letter's meaning or import.  (SMF & RSMF ¶¶ 50, 52; ECF No. 22-4 at 138:7-139:2.)

again asked for an estimate of its withdrawal liability for that year.[9]  (SMF & RSMF ¶ 58.)

In 2020, as Starr Transit and the Union negotiated a successor CBA, Starr Transit decided to withdraw from the Union Plan.  (SMF & RSMF ¶¶ 60-62.)  As a result, on January 19, 2021, the Administrator of the Union Plan wrote to Mr. Glickman and Starr Transit to inform them that the company was being assessed $402,161.00 in withdrawal liability pursuant to ERISA, and asking them to "confirm . . . receipt . . . and your intentions."  (SMF & RSMF ¶ 63; ECF No. 22-19 at 2.)

About two months later, on March 8, 2021, counsel for Starr Transit replied to the Administrator to "request review of the Fund's withdrawal liability assessment."  (SMF & RSMF ¶¶ 64-65; ECF No. 22-20 at 2.)  In that letter, Starr Transit argued that the Union had agreed to indemnify the company for withdrawal liability and that the June 14, 2005 letter from the Union had made clear that this included "**any** liability by virtue of the withdrawal of **any** employer," which the company insisted encompassed liability arising from its own withdrawal.  (SMF & RSMF ¶¶ 64-65; ECF No. 22-20 at 4.)

On that same date, Starr Transit wrote to the Union and Union Plan "to demand that . . . [they] indemnify Starr for the full and complete amount of any withdrawal liability that Starr is required to pay to the Fund."  (SMF & RSMF ¶ 66; ECF No. 22-21 at 2.)  Again, Starr Transit invoked the June 14, 2005 letter, and wrote that it was "clear that in the Letter the Union and Fund have agreed to indemnify and hold Starr harmless against **any** liability by virtue of the withdrawal of **any** employer.  This extraordinarily broad language in the Letter encompasses both third-party

---

[9]      When asked why Starr Transit made these inquiries if it believed the Union had agreed to indemnify Starr Transit for any liability associated with Starr Transit's own withdrawal from the Union Plan, Mr. Glickman testified that he "was concerned that there was a possibility that the Union would not honor" its commitment.  (SMF & RSMF ¶ 59; ECF No. 22-4 at 141:8-10.)

employer participants in the Fund and also Starr itself." (ECF No. 22-21 at 2-3.) Starr Transit warned that if "the Union and/or the Fund refuse to indemnify Starr to the full and complete extent to which they previously agreed in the Letter, then Starr will file suit to enforce their clear and unmistakable rights." (*Id.* at 3.) The present litigation ensued.

## II.   LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 56: Summary Judgment

Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.,* 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)). "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

## III.   DISCUSSION

### A. Count I: Breach of Contract

At root, this is a straightforward contract dispute. The parties disagree about the scope of the indemnification promise that the Union made in 2005 to Starr Transit when the company merged its single-employer pension plan with the multi-employer Union Plan.

Starr Transit rests its case on a June 14, 2005 letter that it received from the Union, which states in part that the letter was intended to summarize the parties' "understanding" that the Union would indemnify Starr Transit for "any liability, damages or claims made against Starr Transit Co.

Inc. or against the Starr Transit Co. Inc. Pension Plan by virtue of the withdrawal of *any employer* from participation in the Teamster Union Local No. 35 Pension Plan." (ECF No. 22-11 at 2 (emphasis added); *see also* ECF No. 22-4 at 97:17-18 ("Mr. Glickman: . . . I hang my hat on the letter that was provided to us in June.").) Starr Transit submits that the reference to "any employer" in the June 14, 2005 letter is broad enough to be read, and should be read, to cover liability arising from Starr Transit's own withdrawal in 2020 from the Union Plan (not just the withdrawal of other employers) even though the very next sentence in the letter states that Starr Transit "will have no liability in the event that any *other* employer withdraws from the" Union Plan. (ECF No. 22-11 at 2 (emphasis added); ECF No. 24 at 12-13.)

In opposition, the Union contends that the language in the June 14, 2005 letter that Starr Transit focuses on (*i.e.*, the one reference to "any employer") was never intended to be read so broadly and in isolation. The Union submits that the actual signed, written agreement between the parties – embodied in the Merger Agreement and subsequent August 12, 2005 letter of indemnification – limits the promise of indemnification to liability arising as a result of the withdrawal of *other* contributing employers (*i.e.*, employers other than Starr Transit itself) and that the express terms of these writings do not contain any "language that could remotely be read as extending the Union's promise to 'hold harmless' Starr for debt it itself incurred." (ECF No. 22-1 at 25-29.)

Based on the Court's review of the undisputed record evidence, the Court finds that, as a matter of law, it is unambiguous that the Union and Starr Transit in 2005 entered into a written agreement wherein the Union promised (in exchange for Starr Transit merging its single-employer pension plan with the multi-employer Union Plan) to indemnify Starr Transit only for liability resulting from the debt or default incurred by "other contributing employers" to the Union Plan,

not for liability incurred as a result of Starr Transit's own withdrawal.

Under New Jersey contract law,[10] a court's "objective in construing a contractual indemnity provision is the same as in construing any other part of a contract – it is to determine the intent of the parties. The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." *Kieffer v. Best Buy*, 205 N.J. 213, 223 (2011) (citing *Mantilla v. NC Mall Assocs.*, 167 N.J. 262, 272 (2001)). And if "the terms of a contract are clear and unambiguous, the moving party is entitled to summary judgment." *Future Sanitation, Inc. v. Evergreen Nat'l Indem. Co.*, Civ. No. 17-347 2019 WL 6456474, at *8 (D.N.J. Nov. 30, 2019) (citing *Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Illinois*, 162 F.3d 789, 792 (3d Cir. 1998)).

Here, the agreements the parties entered into make clear their intent as to indemnification. The "Pension" section of the 2005-2008 CBA (signed by representatives of both Starr Transit and the Union) states that Starr Transit would "merge its Pension Plan into the Teamsters Local 35 Pension Plan as of July 1, 2005 subject to the provision of an Agreement of Merger which *shall* then apply." (ECF No. 22-10 at 17 (emphasis added).) The parties therefore agreed in the CBA that the terms of the Merger Agreement would govern the joinder of the two pension plans. *See Asphalt Paving Sys., Inc. v. Gen. Combustion Corp.*, Civ. No. 13-7318, 2015 WL 167378, at *5 (D.N.J. Jan. 13, 2015) ("[I]inclusion of the word 'shall' sufficiently evinces a . . . clause's mandatory nature." (collecting cases)). Section 5.5 of the Merger Agreement (also signed by representatives of both Starr Transit and the Union) then states that the Merger Agreement "shall control" if there is a conflict with the CBA and that the Union would provide Starr Transit "a letter

---

[10]     Both parties agree that New Jersey law applies. (*See* ECF No. 24 at 8 ("Starr Transit agrees with Local 35 that New Jersey substantive law governing contracts (including indemnification agreements) applies.").)

of indemnity holding . . . Starr Transit harmless as to debts incurred by *other contributing employers*" and that this letter "*shall* be binding on the parties" and would be incorporated into the Merger Agreement. (ECF No. 22-13 at 6 (emphases added).) Finally, the August 12, 2005 letter of indemnity that was subsequently furnished by the Union states that, "[p]ursuant to Section 5.5 of the Merger Agreement," the Union will indemnify Starr Transit "for any claim made against it because of the default or debt incurred by *other contributing employers*" and that Starr Transit "shall not be held liable or responsible for defaults or debts incurred by *other contributing Employers*." (ECF No. 22-15 at 2 (emphases added).)

As the Union underscores (and Starr Transit does not meaningfully contest), nothing in these signed, written documents supports the inference that the Union promised to indemnify Starr Transit for liability arising from Starr Transit's own withdrawal from the Union Plan. To the contrary, the unambiguous language in each point to the same conclusion:  the Union pledged to indemnify Starr Transit only for "default or debt incurred by other contributing employers." (*See* ECF No. 22-15 at 2.)

Confronted with this documented record, Starr Transit wants the Court to look beyond the unambiguous language in the 2005-2008 CBA, the Merger Agreement, and the letter of indemnity and to find a genuine dispute of material fact based on the June 14, 2005 letter's solitary reference to "any employer," which Starr Transit insists could be read expansively to now indemnify Starr Transit for the liability it incurred under ERISA when Starr Transit chose, fifteen years after merging plans, to withdraw from the Union Plan. The Court cannot do so.

At the most basic level, the Court does not find factual support for the proposition that the parties intended the June 14, 2005 letter to be the binding agreement as to the merger of the plans and the Union's promise of indemnification. Unlike the signed CBA and signed Merger

Agreement, the June 14 letter is not signed by both parties and states that it was sent by the Union to confirm the parties' "understanding" at that point, but it nowhere indicates that it intends to bind either party and it does not contain the material terms of the merger between the plans. *See Morales v. Santiago*, 217 N.J. Super. 496, 502 (App. Div. 1987) ("Absence of essential terms from a preliminary agreement is persuasive evidence that the parties did not intend to be bound by it."). Moreover, in the 2005-2008 CBA, the parties expressly agreed that the merger of the plans would be subject to the Merger Agreement, "which shall then apply." (ECF No. 22-10 at 17.)

As explained, both the Merger Agreement and subsequent letter of indemnification (exchanged after the June 14, 2005 letter) expressly state that they shall be "binding" on the parties, and the Union in those documents only agreed to indemnify Starr Transit for liability arising from the debts or defaults of "*other* contributing employers." (*See* ECF No. 22-13 at 6 (emphasis added); ECF No. 22-15 at 2 (emphasis added).)  Based on this record, the Court does not find that the parties' course of dealings after June 14 supports the determination that the parties believed that initial letter to be binding even without execution of the formal, signed agreements that followed. *See K-T Corp. v. JB Assocs.*, 2009 WL 2365970, at *4 (N.J. Super. Ct. App. Div. Aug. 4, 2009) (noting that "[i]n determining whether the parties to a preliminary agreement intend to be bound even without execution of a formal contract, a court should consider . . . the course of dealings between the parties before and after the document's preparation").

Even if the Court were to give the June 14, 2005 letter the import that Starr Transit seeks (*i.e.*, to place it on the same level as the signed, written agreements between the parties such as the 2005-2008 CBA and Merger Agreement), Starr Transit's position that there is ambiguity in this case as a consequence of the letter's reference to "any employer" only holds if the Court disregards – in contravention of the applicable principles of contract interpretation – the other unambiguous

writings.  Such an outcome is contrary to the well-settled principle under New Jersey law that "[w]ords and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose." *Republic Bus. Credit Corp. v. Camhe-Marcille*, 381 N.J. Super. 563, 569 (App. Div. 2005) (quoting *Newark Publishers' Ass'n v. Newark Typographical Union, No. 103*, 22 N.J. 419, 426 (1956)); *see also Hardy ex rel. Dowdell v. Abdul-Matin*, 198 N.J. 95, 103 (2009) ("A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner.").

Indeed, in New Jersey, "[w]here several writings are made as part of one transaction relating to the same subject matter, these writings are to be read together to glean the intent of the parties." *Wyndham Hotels & Resorts, LLC v. Vidaurreta*, Civ. No. 15-1109, 2015 WL 6687558, at *3 (D.N.J. Oct. 30, 2015) (citing *Norwood-Jeb, L.L.C. v. N. River Mews Assocs., L.L.C.*, 2009 WL 1010963, at *7 (N.J. App. Div. Apr. 15, 2009)); *see also Medford Commons, LLC v. Lexon Ins. Co.*, 2019 WL 7183569, at *9 (N.J. App. Div. Dec. 26, 2019) ("[T]wo or more writings which are all parts of one transaction relating to the same subject matter, are to be read and interpreted as one instrument, whether or not they refer to each other." (quoting *Wellmore Builders, Inc. v. Wannier*, 49 N.J. Super. 456, 463 (App. Div. 1958))).  "[T]he recitals in one [writing] may be explained, amplified or limited by reference to the other – the one draws contractual sustenance from the other." *Wyndham Hotels*, 2015 WL 6687558, at *3; *accord Curiale v. Hyundai Cap. Am. Inc.*, 2020 WL 1983231, at *5 (N.J. App. Div. Apr. 27, 2020).

Here, these sound principles of contract interpretation weigh heavily against Starr Transit. Notably, after the Union sent Starr Transit the June 14, 2005 letter, Starr Transit admits that it collaborated with the Union in drafting a Memorandum of Agreement.  (SMF & RSMF ¶ 41; ECF No. 22-12.)  In the jointly-drafted MOA, the parties wrote that "[t]he Union will provide the

Employer with a letter of indemnity holding the Employer harmless as to debts incurred due to *other employers* as out lined in [the June 14, 2005] letter." (SMF & RSMF ¶¶ 42-43; ECF No. 22-12 at 2 (emphasis added).)  Next, the parties negotiated and entered on July 25, 2005, into the Merger Agreement, which (as previously detailed) states that the Union would indemnify Starr Transit only for those "debts incurred by *other contributing employers*." (ECF No. 22-13 at 6 (emphasis added).)  And two weeks later, on August 12, 2005, the Union sent the formal "letter of indemnity" – pursuant to the Merger Agreement and as anticipated by the MOA – to Starr Transit, which again states that it indemnifies the company only for "default or debt incurred by *other contributing employers* to the Teamsters Union Local No. 35 Pension Plan." (ECF No. 22-15 at 2 (emphasis added).)  Starr Transit does not appear to have written at that time to object to the terms of the indemnity letter or to state any understanding contrary to its express terms.

In view of these multiple writings (the MOA, Merger Agreement, and August 12, 2005 letter of indemnity) all unambiguously limiting the Union's promise of indemnification to the withdrawal or defaults of *other* contributing employers (*see* ECF Nos. 22-12, 22-13, & 22-15), there is no reasonable basis to read the June 14, 2005 letter's lonely reference to "any employer" as expanding the scope of the Union's promise of indemnification to encompass Starr Transit's own withdrawal liability.  To arrive at Starr Transit's desired result would require the Court or a subsequent factfinder to improperly "torture" the language in the writings between the parties "to create an ambiguity" where it otherwise does not exist.  *Carifi v. Barberio*, 2020 WL 7330081, at *9 (N.J. App. Div. Dec. 14, 2020); *see also* 88 C.J.S. Trial § 366 (May 2023 ed.) ("[A] court should not strain to create an ambiguity where, in common sense, there is not one.").

Especially in the realm of indemnification, which the New Jersey Supreme Court has indicated differs from "typical contract [law] in one important aspect . . . an [ambiguous] indemnity

provision is . . . 'strictly construed against the indemnitee,'" it would be unreasonable to permit Starr Transit's breach-of-contract claim to proceed further when there is no real sign in the written documents that the parties intended to indemnify Starr Transit for its own withdrawal liability. *See Kieffer*, 205 N.J. at 223 (quoting *Mantilla*, 167 N.J. at 269); *see also Federated Mut. Ins. Co. v. City of Ocean City, N.J.*, Civ. No. 19-21405, 2022 WL 951287, at *3 (D.N.J. Mar. 30, 2022) (Thompson, J.) ("Indemnity contracts are interpreted in accordance with the rules governing the construction of contracts generally.  When the meaning of the clause is ambiguous, however, the clause should be strictly construed against the indemnitee." (quoting *Ramos v. Browning Ferris Indus. of S. Jersey, Inc.*, 103 N.J. 177, 191 (1986))); *Bonefish Cap., LLC v. Autoshred, LLC*, 2022 WL 518021, at *13 (N.J. App. Div. Feb. 22, 2022) ("An ambiguous indemnity provision must be 'strictly construed against the indemnitee.'" (quoting *Kieffer*, 205 N.J. at 225)).

If the parties wanted to indemnify Starr Transit for the company's own withdrawal liability, they could easily have done so.  They did not.  At no point did the parties ever simply write that Starr Transit would be indemnified for liability that might later arise from Starr Transit exiting the Union Plan after joining.  Other than one passing reference to "any employer" in the June 14, 2005 letter, all of the writings expressly limit the promise of indemnification to liability arising from the actions of *other* contributing employers to the Union Plan.  Under these circumstances, the writings must be read together as written, and the Court cannot rewrite their express terms to favor one party over the other.

Accordingly, the Court grants the Union summary judgment on the breach-of-contract claim (*see* ECF No. 1 ¶¶ 33-37), and the claim is dismissed.  Because the Union's counterclaim for declaratory judgment (*see* ECF No. 5 at 12-14 ¶¶ 22-33) is duplicative of its defense to the breach-of-contract claim, the Court will also grant a declaratory judgment in the Union's favor on

the indemnification issue.[11]

### B.  Count II: Detrimental Reliance

Starr Transit contends that even if the breach-of-contract claim fails, the alternative claim for detrimental reliance should survive because the Union made "clear and definite promises of indemnification to Starr Transit" that the company relied on to its detriment.[12]  (ECF No. 24 at 17-18.)  In reply, the Union argues that the detrimental reliance claim fails for largely the same reason as the breach-of-contract claim: there is no proof of any "clear and definite promise" to indemnify Starr Transit for its own withdrawal liability.  (ECF No. 27 at 14-15.)

To state a claim for detrimental reliance (or promissory estoppel) under New Jersey law, a plaintiff must prove "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Millar v. Pitman Bd. of Educ.*, Civ. No. 10-4104, 2011 WL 2417141, at *2 (D.N.J. June 13, 2011) (quoting *Toll Bros. v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 194 N.J. 223, 253 (2008)); *accord In re Att'y Gen. L. Enf't Directive Nos. 2020-5 & 2020-6*, 246 N.J. 462, 497 (2021) ("There are four elements to a claim under the doctrine.").  "Detrimental reliance is a quasi-contract doctrine intended to apply when a party makes an otherwise unenforceable promise, but justice nevertheless requires that the court enforce the promise." *Millar*, 2011 WL 2417141, at *2 (citing *Toll Bros., Inc.*, 944 A.2d at 19); *see also Goldfarb v. Solimine*, 245 N.J. 326, 341 (2021) ("[P]romissory estoppel is not a 'suit based on the contract.'  It is instead a suit based on [a party's] reasonable reliance, to his detriment, on [a] promise . . . .").

---

[11]     To the extent there is any dispute as to the amount of withdrawal liability assessed, the Court does not reach it, and finds that that has not been properly presented for adjudication.

[12]     Starr Transit also faults the Union for not expressly mentioning "detrimental reliance" in its opening brief.  (ECF No. 24 at 16.)

Here, the Court finds that Starr Transit's detrimental reliance claim fails as a matter of law because the record does not support at least two of the four elements – neither a clear and definite promise nor reasonable reliance.[13]

### 1. *Clear and Definite Promise*

"A 'clear and definite promise' is an indispensable element of detrimental reliance." *Facteon, Inc. v. Comp Care Partners, LLC*, Civ. No. 13-6765, 2014 WL 6685380, at *6 (D.N.J. Nov. 26, 2014) (citing *Malaker Corp. S'holders Protective Comm. v. First Jersey Nat. Bank*, 163 N.J. Super. 463, 479 (App. Div. 1978)); *see also Ariotti v. Am. Leisure*, 2018 WL 3796672, at *2 (N.J. App. Div. Aug. 10, 2018) ("[A] 'clear and definite promise,' is the '*sine qua non* for applicability of this theory of recovery.'" (citation omitted)).  In determining whether there is such a promise, courts typically look for "language that can be reasonably construed as . . . 'clear, unconditional and definite.'" *Facteon*, 2014 WL 6685380, at *6 (quoting *Mejias v. Am. Boychoir Sch.*, Civ. No. 11-0562, 2011 WL 3235711, at *5 (D.N.J. July 27, 2011)).

The Court finds no meaningful support for the contention that the Union made a clear and definite promise to Starr Transit that the Union would indemnify Starr Transit for the company's own withdrawal liability.  Starr Transit's CEO Mr. Glickman testified that the company had relied on the June 14, 2005 letter for the promise of indemnification (*see* ECF No. 22-4 at 109:16-17 ("[T]hat's what we relied on, and we didn't want to lose it.")), but the letter does not say that Starr Transit would be indemnified for its own withdrawal, and the Court has already found that any alleged ambiguity in that letter is clarified by the other writings (including those collaboratively drafted and signed by Starr Transit) that all expressly state that the Union agreed to indemnify

---

[13]    Failing to demonstrate any element is fatal to the claim.  *See Gunvalson v. PTC Therapeutics Inc.*, 303 F. App'x 128, 130 (3d Cir. 2008) ("Failing to demonstrate any one of the elements is fatal to their case.").

Starr Transit only for costs and claims associated with the withdrawal or debts of *other* employers contributing to the Union Plan.  Therefore, the June 14 letter cannot serve as the basis for a clear and definite promise sufficient to sustain Starr Transit's claim of detrimental reliance.

In Starr Transit's Supplemental Statement of Material Facts, it cites alleged oral promises made by Union representatives and writes that Mr. Glickman "was told by Local 35 representatives, including Kreiser, that if Starr Transit joined the Local 35 Plan, the only cost that Starr Transit would ever have would be the monthly contributions into the Local 35 Plan."  (SSMF ¶ 4.)  Starr Transits submits that "Kreiser told Glickman more than five (5) times that the only cost that Starr Transit would ever have would be the monthly contributions into the Local 35 Plan." (SSMF ¶¶ 6-11.)  Conspicuously, even these contested statements nowhere say that Mr. Glickman specifically asked or the Union specifically promised that the company would be indemnified for its own withdrawal liability, and the testimony from Mr. Glickman that Starr Transit cites in support of the statements also does not so say.  Instead, Mr. Glickman repeatedly testified that there was an oral assurance that "the only cost that I would ever have would be the monthly contributions into the pension plan and it would be exactly the same as paying into the union medical plan."  (ECF No. 22-4 at 55:13-21.[14])

Such generalized oral assurances that Starr Transit would not have to pay more than "monthly contributions into the pension plan" are not concrete enough to support the claim that

---

[14]     (*See also* ECF No. 22-4 at 58:6-10 ("Q: . . . [D]id you ask anyone from . . . the pension plan fund . . . whether the fund could indemnify Starr or its withdrawal liability if it left the pension plan?  A: I don't recall."), 62:18-22 ("[W]hat I demanded and what I ultimately received was indemnification from the union or it could have been the fund, then we would never have to pay anything into the fund other than the monthly contribution for each employee."), 63:8-13 ("Q: What do you recall the terminology being that you demanded and received?  A: That under no circumstances would Starr be required to pay any funds in addition to the funds that we pay and agree to in our CBA over and above the monthly contribution per employee.").)

the Union made a clear and definite promise that Starr Transit would be indemnified in the event the company chose, fifteen years after merging plans, to withdraw from the Union Plan and to cease making those monthly payments. *See, e.g.*, *Fernandes v. Deutsche Bank Nat'l Tr. Co.*, 157 F. Supp. 3d 383, 388 (D.N.J. 2015) ("These circumstances reflect little more than an ongoing exchange of <u>indefinite</u> promises, and therefore fall far short of a probable showing of a 'clear and definite' promise." (emphasis in original) (quoting *Nye v. Ingersoll Rand Co.*, 783 F. Supp. 2d 751, 766 (D.N.J. 2011))); *Gunvalson v. PTC Therapeutics Inc.*, 303 F. App'x 128, 130 (3d Cir. 2008) (holding that plaintiffs could not demonstrate clear and definite promise where alleged "promises . . . lack[ed] the requisite specificity and clarity" and did not "assert[] [any]thing conclusive").

### 2. *Reasonable Reliance*

Even if these oral assurances were clear and definite enough to satisfy the first element of Starr Transit's detrimental reliance claim, Mr. Glickman's and the company's reliance on these oral assurances was unreasonable as a matter of law when the writings at issue (as detailed above), did not confirm the company's purported belief that it would be indemnified for its own withdrawal.

As a represented commercial party negotiating a contract,[15] Starr Transit cannot sustain a claim of detrimental reliance based solely on generalized oral assurances when the assurances are neither specific to the dispute at issue nor substantiated by the express terms of written agreements

---

[15]   Mr. Glickman testified that Starr Transit had been represented by counsel during the 2005 collective bargaining negotiations. (*See* ECF No. 22-4 at 70:11-23 ("Q: . . . And you testified that in the collective bargaining negotiations in 2005, you had Mr. Levy acting as your counsel; is that right?  A: Correct.  Q: Was Mr. Levy at the bargaining table when you were negotiating the 2005 collective bargaining agreement?  A: Yes.  Q: . . . Was he there at every session when Mr. Kreiser allegedly made you a promise that you have no liability to the fund other than your monthly contribution?  A: At the bargaining sessions, yes.").)

negotiated by the parties and entered into subsequent to those alleged assurances. *See Mellon Bank Corp. v. First Union Real Est. Equity & Mortg. Invs.,* 951 F.2d 1399, 1412 (3d Cir. 1991) ("After consulting with counsel at all stages of the transaction and closing on detailed written documents, it is not reasonable . . . to rely on oral promises . . . ."); *Catahama, LLC v. First Commonwealth Bank*, 601 F. App'x 86, 93-94 (3d Cir. 2015) ("To the extent . . . a sophisticated investor . . . relied on an alleged oral promise . . . and failed to take efforts to protect itself in writing . . . , such reliance was unreasonable and enforcement of the alleged promise is not necessary to avoid injustice."); *Bennett v. Itochu Int'l, Inc.*, 572 F. App'x 80, 84 (3d Cir. 2014) ("Appellants' reliance on oral promises that contradicted the parties' signed writings was unreasonable as a matter of law."); *TekDoc Servs., LLC v. 3i-Infotech Inc.*, Civ. No. 9-6573 MLC, 2012 WL 3560794, at *17 (D.N.J. Aug. 16, 2012) ("[I]t would be 'manifestly unreasonable' for 'most people—and particularly experienced, knowledgeable business people—' to rely on oral assurances when confronted by a contradictory written contract." (quoting *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 436 (D.N.J.), *aff'd*, 172 F.3d 859 (3d Cir. 1998))).

Accordingly, the Court finds that Starr Transit cannot establish the elements necessary for its detrimental reliance claim, and the claim (*see* ECF No. 1 ¶¶ 38-41) is dismissed.

## IV.   CONCLUSION

For the foregoing reasons, and other good cause shown, Defendant's Motion for Summary Judgment (*see* ECF No. 22) is **GRANTED**.  An appropriate Order follows.

Dated: June 30, 2023

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**

21